**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAY PADILLA, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| DISH NETWORK L.L.C., | ) ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Ray Padilla ("Plaintiff" or "Padilla"), individually and on behalf of all others similarly situated, by and through his counsel, brings this Class Action Complaint against Defendant DISH Network L.L.C. ("Defendant" or "DISH"). Plaintiff, on his own behalf and on behalf of a class of similarly situated individuals, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## I.  NATURE OF THE ACTION

1.      Cable and satellite television are a fundamental part of daily life in American households, viewed by many to be as ordinary and essential as utilities. As a rapidly expanding provider of direct broadcast satellite service to customers in Chicago and other cities across the nation, DISH uses its position to collect personal information – such as names, addresses, social security numbers, and credit card numbers – from tens of millions of consumers.

2.      After consumers terminate their service with DISH, however, and this information is no longer needed to provide service or collect payment, DISH continues to maintain personally identifiable information on all of its previous customers indefinitely. This conduct

violates the Satellite Home Viewer Extension and Reauthorization Act, 47 U.S.C. § 338, *et. seq.* ("SHVERA"), which requires satellite operators to destroy personally identifiable information when it is no longer required for the purpose for which it was collected.

3.     Moreover, consumers are unaware that their personally identifiable information is retained indefinitely by DISH, as DISH fails to send annual privacy notices informing consumers that DISH continues to retain their information.  This conduct constitutes additional violations of SHVERA.

4.     Accordingly, Plaintiff asserts claims on his own behalf and on behalf of the other members of the below-defined Classes for violations of SHVERA, 47 U.S.C. § 338 (i)(1) & (i)(6), plus additional claims under Illinois state law on behalf of an Illinois Subclass.

## II.     <u>JURISDICTION AND VENUE</u>

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States, and pursuant to 18 U.S.C. §§ 2520 and 2707 and 18 U.S.C. § 1030.  This Court also has supplemental jurisdiction over Plaintiff's state statutory claims and common-law claims under 28 U.S.C. § 1367.

6.     In addition, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than DISH.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) as: a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District, and DISH conducts substantial business in this

District. Specifically, DISH provides satellite television services for residents and commercial facilities in towns and cities throughout this District, subjecting it to this Court's personal jurisdiction and making it a "resident" of this District for purposes of venue.

## III. PARTIES

*Plaintiff*

8.   Ray Padilla ("Padilla") is a natural person and citizen of the State of Illinois.

*Defendant*

9.   DISH is a Colorado corporation headquartered at 9601 S. Meridian Boulevard in Englewood, Colorado. DISH is a rapidly expanding direct broadcast satellite service provider that currently serves more than 14,000,000 customers in many of the nation's largest cities, including Chicago, New York, Boston, Philadelphia, and Washington, D.C., among many others.

## IV. FACTUAL BACKGROUND

*The Satellite Home Viewer Extension and Reauthorization Act*

10.   On December 8, 2004, Congress passed the Satellite Home Viewer Extension and Reauthorization Act ("SHVERA"), which amended Section 338 of the Communications Act of 1934. In addition to establishing new requirements for satellite transmittal of local stations, SHVERA expanded Section 338 to include privacy safeguards for those who subscribe to satellite television service. A primary objective of this legislation was to protect satellite subscribers' sensitive personal information from misuse as well as improper retention and disclosure. In addition, the legislation aimed to bring the rights of satellite subscribers into line with similar rights already enjoyed by cable subscribers under the Cable Communications Policy Act of 1984 ("CCPA").

11. In fact, when the CCPA was under debate, legislative leaders noted that both common-sense privacy concerns and the constitutional rights of citizens were at stake:

> Cable systems, particularly those with a 'two-way' capability, have an enormous capacity to collect and store personally identifiable information about each cable subscriber. Subscriber records from interactive systems can reveal details about bank transactions, shopping habits, political contributions, viewing habits and other significant personal decisions. It is [therefore] important that national cable legislation establish a policy to protect the privacy of cable subscribers. A national policy is needed because, while some franchise agreements restrict the cable operator's use of such information, privacy issues raise a number of federal concerns, including protection of the subscribers' first, fourth, and fifth amendment rights. At the same time, such a policy must also recognize and unnecessarily or unreasonably impede those flows of information necessary to provide the service to the subscribers.

H.R. Rep. 98-934 at 4666-67 (1984).

12. Although they are nearly 30 years old, these observations are just as relevant today and apply with equal force to subscribers of satellite television service. Now – far more than ever before – DISH and other satellite services are equipped to rapidly collect and indefinitely retain large volumes of this valuable data in their electronic records.

13. There are numerous serious and troubling privacy issues implicated by DISH's practice of retaining and misusing their former customers' personal information, including the risk of identity theft and conversion of personal financial accounts.

14. Accordingly, SHVERA affords consumers significant protection with respect to the collection, maintenance, and disclosure of personally identifiable information ("PII") provided by the subscriber to the satellite carrier.

15. Specifically, the SHVERA requires satellite carriers to provide annual notice setting forth the "nature of personally identifiable information collected;" "the nature, purpose, and frequency of any disclosure" of that information; the "period during which such information

will be maintained;" "the times and place at which the subscriber may have access to such information;" and the limitations imposed on the satellite carrier by this provision of SHVERA. 47 U.S.C. § 338(i)(1).

16.     In addition, SHVERA governs the way that satellite operators are to destroy the PII of former subscribers. SHVERA requires that satellite operators must destroy the PII of former subscribers "if the information is no longer necessary for the purpose for which it was collected" and there are no outstanding requests or orders for such information. 47 U.S.C. § 338(i)(6).

17.     Under SHVERA, "personally identifiable information" is not defined. However, in the context of CCPA, the courts have concluded that it broadly encompasses "specific information about the subscriber, or a list of names and addresses on which the subscriber is included."[1]

### DISH's Collection of Consumers' PII

18.     Founded in 1980, DISH began operating as a provider of home satellite television service in March 1996 – just months after EchoStar launched its first satellite and an uplink station in Wyoming was completed.[2] DISH now serves more than 14 million residential and commercial customers in cities and towns across the United States.[3] In 2011, DISH earned more than $14 billion in gross revenues and more than $1.5 billion in profits.[4]

19.     DISH requires that subscribers provide PII to DISH in order to receive satellite service, including social security number, address, phone number, and credit and debit card information.

---

[1] *See, e.g.*, *Scofield v. Telecable of Overland Park, Inc.*, 973 F.2d 874, 876 fn. 2 (10th Cir. 1992).
[2] http://en.wikipedia.org/wiki/Dish_Network#section_2 (last visited Sept. 12, 2012).
[3] *Id.*
[4] http://www.google.com/finance?q=NASDAQ:DISH&fstype=ii (last visited Sept. 12, 2012).

20. Once DISH obtains that information, it maintains a digital record system with every subscriber's personal information, adding to each consumer's file as they acquire more information.

21. DISH's online Privacy Policy provides, in pertinent part, as follows:

> DISH maintains personally identifiable information about you in our regular business records while you are a subscriber to our satellite television service or other services. We also maintain this information for a period of time after you are no longer a subscriber if the information is necessary for the purposes for which it was collected or to satisfy legal requirements. These purposes typically include business, legal, or tax purposes. If there are no pending requests, orders, or court orders for access to this personally identifiable information, we will destroy the information after it is no longer necessary for the purposes for which it was collected.[5]

*DISH's Unlawful Retention of Consumers' PII*

22. While DISH's Privacy Policy attempts to reassure the customer by stating that it will maintain a customer's PII "if the information is necessary for the purposes for which it was collected or to satisfy legal requirements," in practice, DISH simply retains consumers' PII indefinitely.

23. This indefinite or needlessly protracted retention of PII is prohibited by SHVERA, which requires satellite carriers to "destroy personally identifiable information if the information is no longer necessary for the purpose for which it was collected." 47 U.S.C. § 338(i)(6).

24. DISH also fails to provide SHVERA-mandated privacy notices to customers whose accounts have been closed, but whose information is still retained by DISH. Those consumers are thus unaware that DISH is retaining their information indefinitely.

---

[5] http://www.dish.com/downloads/legal/PrivacyStatement.pdf (last visited Sept. 12, 2012).

25.     SHVERA requires that satellite carriers provide written notice at least once a year regarding the retention and disclosure of PII, "clearly and conspicuously" informing the consumer of "the nature of personally identifiable information collected ... and the nature of the use of such information; [ ] the nature, frequency, and purpose of any disclosure which may be made of such information, including an identification of the types of persons to whom the disclosure may be made; [ ] the period during which such information will be maintained by the satellite carrier; [and] the times and places at which the subscriber may have access to such information." 47 U.S.C. § 338(i)(1).

26.     After the termination of services, DISH fails to provide notice to consumers regarding the type of PII collected and retained, and any disclosure of that information that may have occurred.

**Consumers Place a High Value on Their PII**

27.     At a Federal Trade Commission ("FTC") public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[6]

---

[6] *The Information Marketplace: Merging and Exchanging Consumer Data*, http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited May 20, 2012).

28.     Though Commissioner's Swindle's remarks are more than a decade old, they are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[7]

29.     The FTC has also recognized that consumer data is a new – and valuable – form of currency.  In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis – and profit.[8]

30.     Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information that they share – and who ultimately receives that information.   And by making the transaction transparent, consumers will make a profit from the surrender of their PII.[9]   This business has created a new market for the sale and purchase of this valuable data.[10]

---

[7] *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 20, 2012).

[8] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited May 20, 2012).

[9] *You Want My Personal Data? Reward Me for It*, http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited May 20, 2012).

[10] *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 20, 2012).

31.     In fact, consumers not only place a high value on their PII, but also place a high value on the *privacy* of this data.   Thus, the question is not *whether* consumers value such privacy; the question is "*how much* [consumers] value" that privacy.[11]

32.     Researchers have already begun to shed light on how much consumers value their data privacy – and the amount is considerable.   Indeed, studies confirm that "when [retailers'] privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[12]

33.     Consumers thus value their personal data highly, and place an economic value on the privacy of that data.   In fact, when consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use – two concerns at issue here – they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[13]

34.     Given these facts, any company that transacts business with a consumer and then retains that consumer's PII in contravention of statutorily guaranteed privacy protections has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

*Facts Pertaining to Plaintiff Ray Padilla*

35.     On or about November 1, 2004, Padilla signed up for DISH satellite services.   In order to activate his service, DISH required Padilla to provide DISH with various forms of PII,

---

[11] Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (emphasis added) (last visited April 25, 2012).
[12] Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (June 2011).
[13] *Id.*

including his address, home and work telephone numbers, social security number, and credit card information.

36.     On or about March 1, 2011, Padilla canceled his service with DISH.

37.     On information and belief, as of the date of this filing, DISH still retains Padilla's PII.

38.     Since canceling his service, Padilla has never received notice from DISH informing him that DISH still retains his PII.  Specifically, Padilla has not received any notices from DISH informing him of the nature of the information collected; the nature, purpose and frequency of any disclosure which was made of this information; the period of time during which DISH will maintain this information; and the time and place that Padilla may gain access to this information.

## V.    CLASS ACTION ALLEGATIONS

39.      Plaintiff brings Count I, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All persons in the United States who signed up for satellite service with DISH, and whose personally identifiable information was retained by DISH after the termination of services (the "Retention Class").

Excluded from the Retention Class are DISH and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

40.     Plaintiff brings Count II, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All persons in the United States who signed up for satellite service with DISH, and who were never issued annual written notices from DISH regarding DISH's retention or disclosure of their personally identifiable information (the "Notice Class").

Excluded from the Notice Class are DISH and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

41.    Plaintiff brings Counts III-IV, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a subclass defined as:

> All persons residing in the State of Illinois who signed up for satellite service with DISH, and whose personally identifiable information was retained by DISH after the termination of services (the "Illinois State Class").

Excluded from the Illinois subclass are DISH and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

42.    The Retention Class, Notice Class, and Illinois State Class shall be referred to collectively as "the Class" below unless otherwise specified.

43.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of his claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

44.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the class are so numerous that individual joinder of all Class members in impracticable. On information and belief, there are thousands of consumers who have been affected by DISH's wrongful conduct.  The precise number of the Class members and their addresses is presently

unknown to Plaintiff, but may be ascertained from DISH's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

45. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a. whether DISH engaged in the conduct as alleged herein;

      b. whether Plaintiff and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief and, if so, in what amount(s); and

      c. whether Plaintiff and other Class members are entitled to equitable relief, including but not limited to injunctive relief and restitution.

46. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform misconduct described above.

47. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

48. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** DISH has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class members as a whole.

49. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against DISH, so it would be impracticable for Class members to individually seek redress from DISH's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. CLAIMS ALLEGED

### COUNT I
### Failure to Destroy Personally Identifiable Information
### Violation of § 338(i)(6) of SHVERA
### (On Behalf of the Retention Class)

50. Plaintiff incorporates by reference the allegations contained in Paragraphs 1-49 as though fully set forth herein.

51. DISH is a "satellite provider" as defined by SHVERA because DISH is "an entity that uses the facilities of a satellite or satellite service licensed by the Federal Communications

Commission" in order to "establish and operate a channel of communications for point-to-multipoint distribution of television station signals, and that owns or leases a capacity or service on a satellite in order to provide such point-to-multipoint distribution." 17 U.S.C. § 119(d)(6).

52. SHVERA mandates, among other things, that a satellite carrier "destroy personally identifiable information if the information is no longer necessary for the purpose for which it was collected." 47 U.S.C. § 338(i)(6).

53. After Plaintiff's account and the accounts of each of the other members of the Retention Class were terminated, DISH continued to maintain Plaintiff's PII even though such information was no longer necessary to maintain for the purpose for which it was collected.

54. The foregoing conduct violates 47 U.S.C. § 338(i)(6).

55. Plaintiffs and the Retention Class have suffered injuries as a result of DISH's violation of 47 U.S.C. § 338(i)(6). DISH's failure to destroy the PII of Plaintiff and each of the other members of the Retention Class, as required by 47 U.S.C. § 338(i)(6), constitutes injury in the form of a direct invasion of their federally protected privacy rights. In addition, DISH's failure to comply with SHVERA has deprived Plaintiff and the Retention Class of their ability to make informed decisions with respect to their privacy.

56. Moreover, since Plaintiff and the Retention Class purchased satellite services from DISH, and DISH was obligated to comply with SHVERA, DISH's failure to destroy their PII deprived them of the full value of the services that they bargained and paid for. Because Plaintiff and the Retention Class ascribe monetary value to their ability to control their PII, Plaintiff and the Retention Class have sustained, and continue to sustain, monetary and economic injuries as a direct and proximate result of DirecTV's violation of 47 U.S.C. § 338(i)(6).

57.     Plaintiff's and the Retention Class' PII constitutes personal property. DISH's failure to comply with 47 U.S.C. § 338(i)(6) has also deprived Plaintiff and the Retention Class of the opportunity to control that personal property for its own financial gain. Accordingly, Plaintiff and the Retention Class have sustained, and continue to sustain, monetary and economic injuries as a direct and proximate result of DirecTV's violation of 47 U.S.C. § 338(i)(6).

58.     SHVERA provides a private right of action to consumers who have been aggrieved by a violation of 47 U.S.C. § 338. Specifically, any person aggrieved by any act of a satellite carrier violating 47 U.S.C. § 338 may recover "actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher." 47 U.S.C. § 338(i)(7)(A).

59.     In addition, any person aggrieved by any act of a satellite carrier violating 47 U.S.C. § 338(i) may recover punitive damages and "reasonable attorneys' fees and other litigation costs reasonably incurred." 47 U.S.C. § 338(i)(7)(B)&(C).

60.     Plaintiff, on behalf of himself and the Retention Class, therefore seeks redress as provided by 47 U.S.C. § 338(i)(7), including liquidated damages to the full extent permitted by SHVERA, punitive damages, and reasonable attorneys' fees and other litigation costs.

## COUNT II
### Failure to Provide Adequate Notice
### Violation of § 338(i)(1) of SHVERA
### (On Behalf of the Notice Class)

61.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-49 as though fully set forth herein.

62.     After the termination of services, DISH continued to maintain Plaintiff's PII and the PII of each of the members of the Notice Class.

63.     Plaintiff and each of the members of the Notice Class did not receive a yearly privacy notice from DISH as required under SHVERA.

64.     The foregoing conduct violates 47 U.S.C. § 338(i)(1).

65.     Plaintiff and the Notice Class have suffered images as a result of DISH's violation of 47 U.S.C. § 338(i)(1).  DISH's failure to issue annual notices under SHVERA, as required by 47 U.S.C. § 338(i)(1), constitutes injury in the form of a direct invasion of the federally protected privacy rights of Plaintiff and the Notice Class.  In addition, DISH's failure to comply with SHVERA has deprived Plaintiff and the Notice Class of their ability to make informed decisions with respect to their privacy.

66.     Moreover, since Plaintiff and the Notice Class purchased satellite services from DISH, and DISH was obligated to comply with SHVERA, DISH's failure to issue the requisite annual notices deprived them of the full value of the services that they bargained and paid for. Because Plaintiff and the Notice Class ascribe monetary value to their ability to control their PII, Plaintiff and the Notice Class have sustained, and continue to sustain, monetary and economic injuries as a direct and proximate result of DISH's violation of 47 U.S.C. § 338(i)(1).

67.     Plaintiff's and the Notice Class' PII constitutes personal property.  DISH's failure to comply with 47 U.S.C. § 338(i)(1) has also deprived Plaintiff and the Notice Class of the opportunity to control that personal property for its own financial gain.  Accordingly, Plaintiff and the Notice Class have sustained, and continue to sustain, monetary and economic injuries as a direct and proximate result of DISH's violation of 47 U.S.C. § 338(i)(1).

68.     SHVERA provides a private right of action to consumers who have been aggrieved by a violation of 47 U.S.C. § 338.  Specifically, any person aggrieved by any act of a satellite carrier violating 47 U.S.C. § 338 may recover "actual damages but not less than

liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher." 47 U.S.C. § 338(i)(7)(A).

69.     In addition, any person aggrieved by any act of a satellite carrier violating 47 U.S.C. § 338(i) may recover punitive damages and "reasonable attorneys' fees and other litigation costs reasonably incurred." 47 U.S.C. § 338(i)(7)(B)&(C).

70.     Plaintiff, on behalf of himself and the Notice Class, therefore seeks redress as provided by 47 U.S.C. § 338(i)(7), including liquidated damages to the full extent permitted by SHVERA, punitive damages, and reasonable attorneys' fees and other litigation costs.

<u>**COUNT III**</u>
**Violation of the Illinois Cable and Video Customer Protection Law**
**220 ILCS § 5/22-501**
**(On Behalf of the Illinois Subclass)**

71.     Plaintiff adopts and incorporates by reference paragraphs 1-70 of this Complaint as if fully set forth herein.

72.     The Illinois Cable and Video Customer Protection Law ("Cable and Video Law") provides, in pertinent part, that

> Cable or video providers shall not disclose the name, address, telephone number or other personally identifying information of a cable service or video service customer to be used in mailing lists or to be used for other commercial purposes not reasonably related to the conduct of its business unless the cable or video provider has provided to the customer a notice, separately or included in any other customer service notice, that clearly and conspicuously describes the customer's ability to prohibit the disclosure. Cable or video providers shall provide an address and telephone number for a customer to use without a toll charge to prevent disclosure of the customer's name and address in mailing lists or for other commercial purposes not reasonably related to the conduct of its business to other businesses or affiliates of the cable or video provider. ***Cable or video providers shall comply with the consumer privacy requirements of the Communications Consumer Privacy Act, the Restricted Call Registry Act, and 47***

*U.S.C. 551 that are in effect as of June 30, 2007* (the effective date of Public Act 95-9) and as amended thereafter.

220 ILCS 5/22-501(p) (emphasis added).[14]

73.     After Plaintiff terminated his satellite service with DISH, DISH continued to maintain Plaintiff's PII, even though such information was no longer necessary to maintain for the purpose for which it was collected. DISH's conduct thus violated 47 U.S.C. § 338(i)(6).

74.     In addition, DISH continued to maintain Plaintiff's personal information even after Plaintiff terminated his service. However, Plaintiff did not receive a yearly privacy notice from DISH as required under the CCPA. DISH's conduct thus also violated 47 U.S.C. § 338(i)(1).

75.     The foregoing violations of 47 U.S.C. § 338 constitute violations of the Illinois Cable and Video Law.

76.     Plaintiff and the Illinois State Class have suffered injuries as a result of DISH's violations of the Cable and Video Law. DISH's failure to destroy the PII of Plaintiff and the Illinois State Class, as required by the Cable and Video Law – as well as 47 U.S.C. § 338(i) – constitutes injury in the form of a direct invasion of statutorily protected privacy rights. In addition, DISH's failure to issue annual notices, as required the Cable and Video Law as well as 47 U.S.C. § 338(i), has deprived Plaintiff and the Illinois State Class of their ability to make informed decisions with respect to their privacy.

77.     The Illinois Cable and Video Law establishes a private right of action against cable and satellite providers for violations of the Act:

---

[14] The Cable and Video Law applies to satellite carriers, such as DISH. The statute defines "cable or video provider" as "any person or entity providing cable service or video service pursuant to authorization under (i) the Cable and Video Competition Law of 2007; (ii) Section 11-42-11 of the Illinois Municipal Code; (iii) Section 5-1095 of the Counties Code; or (iv) a master antenna television, satellite master antenna television, *direct broadcast satellite*, multipoint distribution services, and other providers of video programming, whatever their technology. 220 ILCS 5/22-501 (emphasis added).

> Any customer, the Attorney General, or a local unit of government may pursue alleged violations of this Act by the cable or video provider in a court of competent jurisdiction. A cable or video provider may seek judicial review of a decision of a local unit of government imposing penalties in a court of competent jurisdiction. No local unit of government shall be subject to suit for damages or other relief based upon its action in connection with its enforcement or review of any of the terms, conditions, and rights contained in this Act except a court may require the return of any penalty it finds was not properly assessed or imposed.

220 ILCS § 5/22-501(r)(4).

78.     Each satellite subscriber who suffers a violation of the Cable and Video Law's privacy protections, as set forth above, is entitled to receive a credit of $150.00 from the satellite provider. If the customer is no longer taking service from the provider, the customer is entitled to receive the payment by check. 220 ILCS § 5/22-501(s).

79.     Plaintiff, on behalf of himself and the Illinois State Class, therefore seeks redress as provided by 220 ILCS § 5/22-501, including the statutorily required cash payment in addition to reasonable attorneys' fees and other litigation costs.

## COUNT IV
### Breach of Implied Contract
### (On Behalf of the Illinois Subclass)

80.     Plaintiff adopts and incorporates by reference paragraphs 1-79 of this Complaint as if fully set forth herein.

81.     Those who subscribed to DISH's satellite service, including Plaintiff, were required by DISH to provide their social security number, address, phone number, and credit card information.

82.     In providing this personal data to DISH, Plaintiff and other members of the Illinois State Class entered into an implied contract with DISH (the "Contract"). Pursuant to the Contract, DISH became obligated to safeguard this data through all reasonable measures, and not

retain it any longer than necessary for its own business purposes. This obligation includes complying with industry standards.

83. The industry standard applicable to the credit-card transaction described above is set forth in Requirement 3.1 of the Data Security Standard (DSS) promulgated by the Payment Card Industry Security Standards Council. Specifically, that standard requires merchants to implement the following security measures:

> Keep cardholder data storage to a minimum by implementing data retention and disposal policies, procedures and processes, as follows.
>
> Implement a data retention and disposal policy that includes:
> - Limiting data storage amount and retention time to that which is required for legal, regulatory, and business requirements
> - Processes for secure deletion of data when no longer needed
> - Specific retention requirements for cardholder data
> - A quarterly automatic or manual process for identifying and securely deleting stored cardholder data that exceeds defined retention requirements[.][15]

84. DISH breached its Contract with consumers by failing to adopt and comply with the foregoing industry-standard practices, and by failing to destroy PII after the information was no longer necessary for the purpose for which it was collected.

85. In addition, because the laws existing at the time and place of the making of the Contract are and were incorporated into the Contract, the Contract included obligations for the parties to abide by all statutory and legal requirements, including those imposed by SHVERA and the Illinois Cable and Video Law.

86. Plaintiff and the Illinois State Class performed their obligations under the Contract by paying the consideration owed to Defendant for the provision of satellite service, and by complying with all applicable laws then in force.

---

[15] PCI Security Standards Council LLC, Navigating PCI DDS: Understanding the Intent of the Requirements, v2.0 (October 2010), p. 20.

87. DISH's failure to perform its contractual obligations imposed by SHVERA and the Illinois Cable and Video Law – *i.e.*, the timely destruction of consumers' PII – constitutes a material breach of the Contract.

88. Plaintiff and the Illinois State Class have suffered actual damages as a result of DISH's breach in the form of the value Plaintiff and the Illinois State Class ascribe to the confidentiality and timely destruction of their PII. This amount is tangible and can be calculated at trial.

89. Further, a portion of the services purchased by Plaintiff and the Illinois State Class was intended to pay for DISH's costs in timely destroying its customers' PII, as required by SHVERA and the Illinois Cable and Video Law.

90. Because Plaintiff and the Illinois subclass were denied services that they bargained and paid for and were entitled to receive—*i.e.*, confidentiality of their PII and timely destruction of same—Plaintiff and the Illinois subclass incurred actual monetary damages in that they overpaid for the services they bargained for.

91. Accordingly, Plaintiff and the Illinois subclass seek an order declaring that DISH's conduct constitutes a breach of contract, and awarding Plaintiff and the Illinois subclass damages in an amount to be calculated at trial.

## VII. <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## VIII.  <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Classes proposed in this Complaint, respectfully requests that the Court enter an Order awarding the following relief:

A. Declaring that this action may be maintained as a class action, and certifying the Classes as requested herein;

B. Enjoining DISH from the unlawful practices and statutory violations asserted herein;

C. An Order awarding liquidated damages pursuant to SHVERA;

D. An Order awarding punitive damages pursuant to SHVERA;

E. An Order awarding compensatory and punitive damages pursuant to the Illinois statutes and common-law causes of action asserted herein;

F. An Order awarding attorneys' fees and costs pursuant to SHVERA; and

G. Such other and further relief as may be just and proper.

Dated: September 13, 2012

Respectfully submitted,

RAY PADILLA, on behalf of himself and all
others similarly situated,

By: _____
    One of the Attorneys for Plaintiff
    and the Proposed Putative Classes

Joseph J. Siprut
*jsiprut@siprut.com*
James M. McClintick
*jmcclintick@siprut.com*
Aleksandra M.S. Vold
*avold@siprut.com*
SIPRUT PC
17 N. State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000
Fax: 312.948.9196